## STACKPOLE v. NORTHERN PAC. RY. CO.

(Circuit Court, D. Oregon. March 13, 1903.)

### No. 2,716.

**1. JUDGMENT ON FAILURE TO ANSWER—HEARING AS TO DAMAGES—STIPULATION.**

In an action for personal injuries, it was stipulated that a trial should be had "by the court, without jury, to assess the amount of damages, if any, to which the plaintiff is entitled in the suit; the defendant filing no answer and making no defense on the question of negligence, and the procedure to be in all respects in accordance with the provisions of section 249 of Hill's Annotated Laws of Oregon, as amended (section 185, B. & C. Comp. 1901)," etc. *Held*, that there was not only an admission of negligence, but of injury as the result of such negligence, and at least nominal damages.

**2. DAMAGES—SIMULATING INJURY—EVIDENCE—SUFFICIENCY.**

Evidence examined, and *held* insufficient to establish that injury to a passenger in a railroad collision, apparently resulting in hysteria, accompanied by a contracture of the right foot, was simulated.

J. C. Moreland, for plaintiff.
C. H. Carey and B. S. Grosscup, for defendant.

BELLINGER, District Judge. This is an action for damages for injuries alleged to have been sustained in an accident on the Northern Pacific Railway Company's line on the 9th of October, 1901. The cause is tried under the provisions of section 185, B. & C. Comp. 1901, and in pursuance of the following stipulation:

"At this time appears the plaintiff, by J. C. Moreland, her attorney, and defendant appears by Carey & Mays, its attorneys, and in open court it is stipulated by the parties that, in consideration of the general appearance now entered by the defendant corporation, a trial shall be had by the court, without jury, to assess the amount of damages, if any, to which the plaintiff is entitled in this suit, the defendant filing no answer and making no defense on the question of negligence, and the procedure to be in all respects in accordance with the provisions of section 249 of Hill's Annotated Laws of Oregon, as amended (section 185, B. & C. Comp. 1901), which statute, for the purposes of this case, shall be deemed the rule of practice of this court."

Plaintiff was a passenger on the cars of the defendant company on the day in question; having taken passage thereon, with her husband and daughter, about 8:30 o'clock in the evening, at Deer Lodge, Mont. She had been on the cars probably 20 minutes. She was occupying a seat in the Pullman car, and, as she alleges and testifies, was standing up, arranging parcels, when, as the train approached the town of Garrison, a station 11 miles distant from Deer Lodge, the passenger train collided with a freight car upon the main track. The plaintiff claims that the shock of the collision threw her against the side of the car, injuring her back, with the result that while she did not experience much, if any, pain at first, except a muscular soreness or bruised feeling in the back, as time went on she gradually became worse, until finally her condition became that of hysteria, accompanied by a contracture of the right foot.

The defendant denies that plaintiff suffered any physical injury as the result of the accident, and claims that, if she is suffering as now appears, it is due solely to her predisposition to hysterical attacks, and that this condition has been brought about, if it exists, by suggestion. The defendant, however, does not concede that plaintiff is injured, but says that she is simulating injury. The defendant's contention is that the plaintiff is what is called a "malingerer"; that she is simulating the symptoms of the injury which she claims to have sustained.

As to the location of the injury received in the accident, the plaintiff's impression, derived from the sensation she experienced, is that she was struck on the left of the spine, near the shoulder blade; that the injury so received caused her "excruciating pain to get up," and when she was up "it was hard to get down"; that her foot "gradually got stiffer and stiffer," until she no longer had control of it; that it is not now as rigid as it has been, and has more sensation than formerly, but is just as helpless. The plaintiff was first treated by Dr. Coffey, the company's surgeon. Thereafter Dr. Wells became, and still is, her physician. Dr. Coffey was first called to attend the plaintiff about October 11th, two days after the accident. He examined her, but found nothing to indicate any injury. He took her to the company's hospital, where she remained under treatment until about the 18th of January, when she was removed to Dr.

Coe's sanitarium, where she was treated by Drs. Gillespie and Coe until about the 6th of February, when she was taken to her home, in the city, where she has since remained.

Dr. Coffey testifies that while he treated plaintiff she complained of pain in the back and limbs; that he could see no evidence of this, and thought that she laid more stress "upon the pain feature of the case" than was justifiable; that when she had been in bed some three or four or five weeks he assisted her to get up, in the expectation that she would gradually gain strength and be able to walk. At that time her foot turned, and this was the first that he noticed anything wrong with it. It was not very rigid, and still it was turned down some. About this time she began to talk of a claim against the railroad company. The doctor does not remember the amount of the claim talked about, but it was a considerable sum. His impression is that she wanted some damages, but not a great amount, in addition to her expenses.

About the 20th of January Dr. A. C. Smith, at the company's instance, examined plaintiff. In answer to his inquiry, plaintiff informed him that her most pronounced symptom was an inability to flex the right foot. The doctor testifies: That on examination of that foot he found it extremely extended, with the toes flexed; the muscular contraction in the effort of this extreme extension and flexion being so pronounced that it produced a slight tremor. That he proceeded, cautiously and gently as possible, in the endeavor to try to flex the foot, but without avail. The contracture of the muscles of the calf was so pronounced that it was impossible to flex the foot, even while using considerable force. That he then tried to flex the knee, which he found also stiff and rigid, and all the muscles of the thigh, both anterior and posterior, rigidly contracted. That the plaintiff here made exclamations of pain, as well as at the ankle, declaring that any effort to flex the knee was very painful. He then proceeded with tests to determine whether there were any anæsthetic areas, and found, as she reported, lack of sensibility in most of the leg, and all of the outer surface of the leg, and the lower third of the outer surface of the thigh. He found no disturbance of special senses, as to pulse rate, condition of heart, and as to the digestive and other intestinal functions, all of which he found normal. He found no pathognomonic symptom of hysteria, except this contracture. He was suspicious that there was a certain element of simulation in the case, and, with the idea that this contracture was too forcible for any person of ordinary muscular development to maintain voluntarily for any length of time, he sat down at the bedside, leaving the patient's feet uncovered, but with his back to the feet, and his face toward the patient, and engaged her in general conversation concerning many topics, the principal of which was her son. After this had progressed probably a half hour, he suddenly turned and looked at the feet, both of which were in a normal position; but the right quickly went down to a state of extreme contracture, as before. He then assisted her into a sitting posture, which seemed to cause her much pain, according to her own statements, and found that the rigidity of the muscles which produced fixation of the knee in the

extended position, when once overcome, and she was in a sitting posture on the side of the bed, was no longer painful to her; that, on the contrary, she sat in a perfectly normal position, with the foot still extended. In testing for loss of sensation or hypersensation by finger applications of slight pressure, demonstrations of pain were, in his opinion, rather extravagant. To determine whether there was some exaggeration of these responses, he suggested to the nurse that a certain point on the back is always excessively tender in cases of this sort, and he thereupon placed his finger on that point, with the effect of producing violent demonstrations of pain at once at a point usually not subject to that excessive sensitiveness. Except while in a sitting posture, the knee was rigid. While in bed it was in the extended position and extremely rigid. It was overcome with difficulty, and with apparent pain to her. After leaving the bed, in making the step or two from the bed to the chair, this extreme rigidity of the knee gave way to the very opposite condition, and the knee, with the foot fully extended, so much so ·that the dorsal aspect of the toes came in contact with the floor, gave way down with each effort to make a step—the very opposite of the condition that had prevailed earlier in the examination.

A few days later a second examination was made of the plaintiff by Dr. Smith, assisted by Dr. George Wilson and Dr. Coffey. The same violent contracture existed as before. The extended position of the knee was even more pronounced, and the exclamations of discomfort, or of actual pain, from endeavors to flex the knee, were more pronounced. The anæsthetic areas differed from those on the former examination, and were more widespread. Her reports of pain here, and sensitiveness there, were more variable. The application of the test tube to a certain spot would produce a response, and then later in the same examination an application of some other material—for instance, a match—would elicit the response that she could not feel it at all. The plaintiff was assisted to the side of the bed in order to test the sensibility of the surface of her back, and to test for her reflexes. In this position, and while her feet were hanging down, her knees in a natural pose, flexed at right angles with the thigh, without pain at any time, Dr. Wilson asked her various questions relating to the history of the case. While plaintiff's attention was thus engaged, Dr. Smith went round to the opposite side of the bed, and, looking under, saw that both of plaintiff's feet were at right angles with the leg. Dr. Coffey's attention was called to the same circumstance. Thereafter, while the patient's attention was engaged by Dr. Smith, Dr. Wilson made a similar examination, with the like result.

While at Dr. Coe's sanitarium, tests for anæsthesia were made at different times by Dr. Coe and by Dr. Harry Lane. The variableness of the results produced by these examinations led both of these physicians to arrive at the conclusion already reached by Drs. Coffey, Smith, and Wilson—that the plaintiff was either simulating injury, or was greatly exaggerating it.

Some time after these examinations were made, and in the early

part of March, the plaintiff was examined by Drs. Josephi, Wells, Williamson, and Giesy. The examination lasted about an hour, during which time an effort was made by physical force to flex plaintiff's foot; but these doctors, succeeding one another in this effort, and using all the strength of which they were capable, were unable to make any impression upon the contracture. Dr. Josephi made a second examination within a day or two, with the same result. These physicians also made tests for sensation. Their conclusion was that the case was one of traumatic hysteria, and that there was neither simulation nor exaggeration by the plaintiff.

Testimony was introduced on defendant's behalf to the effect that plaintiff was not standing up, but was seated, when the accident occurred, and that she received no physical injury from it. The fact, however, of such injury as a result of the accident, is not in issue. The defendant's default admits it. It admits negligence, and injury as the result of such negligence, and at least nominal damages. The stipulation of the parties does not affect the operation of the statute under which the case is submitted to the court without a jury upon the question of damages. The stipulation attempts to interpret the statute, not to control it.

The questions to be decided relate to the extent of the injury suffered, and the compensation to be made therefor if such injury is of a character to entitle plaintiff to more than nominal damages.

If it is assumed that the plaintiff did not receive physical injury at the time of the accident, it does not follow that she is attempting a deception. Medical authors state not only that hysterical contracture may appear after trifling injuries, but that psychic shock alone may be the exciting cause of it. The mental disturbance created by a condition of hysteria from this, as from other causes, is sufficient to account for statements not in fact true, but honestly believed to be true by the person afflicted. It is in evidence that plaintiff's daughter, who was on the platform of the car when the shock came, was thrown down, although not injured. The excitement and worry that would result from such an incident to a person of hysterical temperament, such as I conclude the plaintiff to be, might have a contagious effect upon her. If not in itself a sufficient exciting cause to account for plaintiff's condition, it would re-enforce the influence of the shock experienced in her own person. It is known that the profound disturbances of hysteria may follow insignificant exciting causes, and such disturbances are sufficient to account for what would otherwise be unaccountable in the conduct of the person affected.

Plaintiff testified that some of the nurses told her that there was a bruise on her back. That there was no such bruise is shown by the testimony of Dr. Coffey. The nurses were not called to testify as to such an appearance. It is probable, however, that a statement of the character referred to was made to plaintiff, or is believed by her to have been made, as she testifies. Such a statement necessarily implies physical injury, and suggests the explanation of the occurrence as testified to by the plaintiff. She does not state positively that she was thrown against the car. She says:

"I was thrown, as near as I know, to the best of my knowledge, against the window sill or casement, or possibly some hard substance of the seat. I cannot tell exactly how it happened, for it was sudden."

This statement is apparently an inference which the witness draws from her symptoms. If the symptoms are real, it is reasonable that she should attribute them to physical violence of some kind; and the idea that she was thrown by the shock of the accident against the side of the car, or some hard substance in the seat, would naturally occur to her. Such in fact is necessarily the explanation of physical injury under the circumstances. The case admits of no other.

Is the plaintiff pretending an injury that she has not received? Is she a malingerer? The examinations made by the physicians employed by each side have led to opposite conclusions. In other words, the "doctors disagree." Upon each side the witnesses are all men of high character, professionally and otherwise. The examination made in the defendant's behalf was shortly after the accident. That made for the plaintiff was several months later. The opinions of the physicians can be reconciled only upon the theory that the plaintiff was malingering at the time she was examined by the physicians whose conclusions are unfavorable to her, and that, having begun with dissimulation or exaggeration of symptoms, by suggestion and environment she gradually became in fact hysterical; that a constant effort, in other words, to maintain a simulated contracture, has produced a real, and possibly a permanent, one. But there is an insuperable difficulty in the way of this theory: What suggested to the plaintiff this form of dissimulation? What did she know about traumatic hysteria, or about contracture as a symptom that sometimes attends it? These are not matters of common knowledge. They are known only to the medical class, and possibly to a few others who through some chance have had opportunity to acquire such information. There is nothing in plaintiff's antecedent life to indicate that she had any information, or opportunities for information, in respect to them, and there can be no presumption of exceptional information in order to discredit her. Moreover, if she had this exceptional knowledge, she knew that disturbance of the vision is one of the most frequent symptoms of hysteria, and that the other special senses—of taste, hearing, and smell—are frequently involved. Why did the plaintiff mimic a contracture, and not assume a disorder of one or more of these senses—a deception practically impossible of discovery?

It is evident that the plaintiff did not think of damages in the beginning of her complaint, as she must have done if she was a malingerer. She spoke slightingly of her injury, and, when symptoms of serious disorder appeared, placed herself in the hands of the railroad company's physician, and went to the company's hospital. It was not until after the chief surgeon of the company, watchful of his employer's financial interest, wired Dr. Coffey, from Missoula, that the plaintiff's case would not be treated as a railroad case, that the idea of damages appears to have occurred to her. When informed of the chief surgeon's order, she said she thought the company ought to stand her expenses, and that "we would wait." This last statement

probably referred to an intimation which Dr. Coffey says he had given to the plaintiff about her bill. When the chief surgeon, figuratively speaking, had turned her out of the hospital doors, and Dr. Coffey began the experiment of helping his hysterical patient along with "intimations" about his bill, the question of fair treatment in the payment of her medical expenses occurred to her, and later became the claim for damages she now makes.

The variableness of the localities of sensation when tests were made for anæsthesia, and the exclamations of pain, in localities not subject to sensitiveness, upon finger pressures made by the physician, accompanied by his statement—made to mislead the patient—that pain usually resulted from pressure at that point, are relied upon by the defendant to prove that plaintiff was pretending what she did not feel. But as to this there is complete answer in Bailey on Accident and Injury—a medical work cited by the defendant—which says:

"Hysterical anæsthesia may come and go, be permanent or transitory, or may frequently change its situation, and may disappear during the various intoxications. Its locality can frequently be made to change during the hypnotic sleep, and suggestion received during waking hours may cause it to disappear or to assume different topographical distributions."

And Oppenheimer on Diseases of the Nervous System says that:

"It should not be forgotten that the phenomena of the neuroses are subject to great variability, so that the results of examinations made at different times need not be exactly similar."

There is a further explanation by Janet, an author quoted in Bailey on Accident and Injury, of—

"The apparent contradiction of hysterical phenomena by the theory of a limitation of the field of consciousness. Mental actions go on, but are independent of the patient's knowledge."

The exclamations of the patient, when finger pressures by the physician were accompanied with the statement that pain in indicated localities usually followed such pressure, are what was to be expected. Hysteria is said to be a disease of suggestibility. The pain in these instances was suggested by the physician, but it was none the less real on that account.

The fact that plaintiff's foot returned to its normal position, as testified to by Drs. Smith, Wilson, and Coffey, does not admit of doubt. The explanation made in her behalf is that, these examinations having been made in the early stage of the disease, the contracture had not then acquired the persistence it now has. But this explanation does not account for the fact that the foot was absolutely rigid and straight when under examination, resisting all efforts to flex it by force, and that it was only when the patient's attention was diverted for a considerable time, and when the foot was not under observation, that its condition became normal. As already stated, contractures may often be made to relax by suggestion, and it may be that the conversation by which plaintiff's mind was diverted from her condition operated, by way of suggestion, to produce the conduct mentioned. It must be admitted, however, that the facts referred to create a suspicion that plaintiff was exaggerating her

symptoms—a thing a morbidly sick person might do without any fraudulent intent.

I am convinced that the present serious character of the hysteria from which plaintiff suffers is due in large part to her environment, and to circumstances related to the present action; and for these the defendant is, of course, not responsible. The idea of injury is fixed by the desire for damages. As stated by Bailey, on the Relation of Accident and Injury to Diseases of the Nervous System:

"The constant questionings and examinations by lawyers and doctors are most potent suggesting influences. They render the consciousness still more limited, and give an increased permanency to the fixed idea of the hysterical patient."

The force used by the medical witnesses who have testified for plaintiff probably made plaintiff's condition worse than it would otherwise have been. The use of force, according to Oppenheimer, another medical authority cited in the case, is never advisable. "The attempt to reduce a contracture by force always leads to a worse condition." There were four of these physicians who attempted to overcome plaintiff's contracture by force. They took turns as rapidly as possible. Each one "pushed and pulled" until "tired out." Each used his "utmost muscular effort" to overcome the contracture, and this effort was kept up for about an hour. This athletic performance resulted in failure, as might have been expected, unless there was reason to suppose that plaintiff was simulating injury; and, with or without a suspicion of such a thing, it goes without saying that any test likely to aggravate the disease, if there was disease, was ill advised. Furthermore, I doubt whether plaintiff's condition now is as serious as she believes, and as those who have interested themselves in her behalf as relatives and friends have, without question as to motive, led her to believe it to be. As already stated, there is no disorder of any of the special senses, and her pulse rate, condition of heart, digestive and other intestinal functions, are normal. There is no impairment of will power, no loss of flesh, nor atrophy of the affected limb. She testified with clearness and without nervousness. She was what may, under the circumstances, be called a robust witness—all of which, tending strongly against dissimulation, are hopeful indications in her case.

The damages which the plaintiff has sustained as a result of the injuries complained of are assessed at the sum of $3,000, and in addition thereto the sum of $377 for the professional services to the plaintiff rendered by Dr. Coffey.